## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**MICHAEL D. JENKINS,**

                **Plaintiff,**

**-vs-**                             **Case No.  6:14-cv-377-Orl-41DAB**

**COMMISSIONER OF SOCIAL
SECURITY,**

                **Defendant.**

_____

### REPORT AND RECOMMENDATION

## TO THE UNITED STATES DISTRICT COURT

Plaintiff Michael D. Jenkins brings this action pursuant to the Social Security Act (the Act), as amended, Title 42 United States Code Section 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (the Commissioner) denying his claim for Disability Insurance Benefits (DIB) under the Act.

The record has been reviewed, including a transcript of the proceedings before the Administrative Law Judge (ALJ), the exhibits filed and the administrative record, and the pleadings and memoranda submitted by the parties in this case.  Oral argument has not been requested.

For the reasons that follow, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED.**

## I.	BACKGROUND

### A.	Procedural History

Plaintiff filed for a period of disability and disability insurance benefits on June 1, 2012, alleging an onset of disability on January 1, 2006, due to a hip injury, diabetes, hypertension, hyperlipidemia, posttraumatic stress disorder (PTSD), congestive heart failure, unsuccessful back

surgery, and cervical and lumbar spine impairment. R. 165.  R. 147-48, 161. His application was denied initially and upon reconsideration.  R. 89-92, 95-99. Plaintiff requested a hearing, which was held on December 19, 2012, before Administrative Law Judge Mary Montanus (hereinafter referred to as the "ALJ").  R. 38-67.  In a decision dated July 24, 2013, the ALJ found Plaintiff not disabled as defined under the Act from January 1, 2006 to September 30, 2009[1].  R. 16-36. Plaintiff timely filed a Request for Review of the ALJ's decision.  R. 233-48.  The Appeals Council denied Plaintiff's request on January 6, 2014.  R. 1-6.  Plaintiff filed this action for judicial review on March 7, 2014. Doc. 1.

### B.      Medical History and Findings Summary

Plaintiff was born on July 24, 1964 and was forty-nine years old at the time of the ALJ's decision.  R. 28, 147.  He has a high school education and past work as a corrections officer, a loss prevention officer, and in a bail bonds office.  R. 28, 43, 60-61, 167.  Plaintiff's date of last insured is September 30, 2009.  R. 21.  Plaintiff had previously applied for disability benefits, and a previous administrative law judge had issued an unfavorable decision on March 22, 2010, finding Plaintiff not disabled through his date last insured. R. 19.  However, ALJ Montanus noted that Plaintiff argued the current record included new and material evidence, and consequently, the ALJ did not apply *res judicata* but considered whether Plaintiff was disabled from his alleged onset date (January 1, 2006) through his date last insured (September 30, 2009).  R. 19, 29.

Plaintiff's medical history is set forth in detail in the ALJ's decision.  By way of summary, Plaintiff complained of a hip injury, diabetes, hypertension, hyperlipidemia, PTSD, congestive heart failure, unsuccessful back surgery, and cervical and lumbar spine impairment.  R. 165.  After reviewing Plaintiff's medical records and Plaintiff's testimony, the ALJ found that Plaintiff suffered

---

[1]To be eligible for DIB, a claimant must show that he became disabled prior to the expiration of his insured status. See 42 U.S.C. §§ 416(i)(3), 423(a), (c); 20 C.F.R. §§ 404.101, 404.130, 404.131; *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005); *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981).

from the severe impairments of obesity, hypertension, cardiomyopathy, diabetes mellitus, coronary artery disease, chronic obstructive pulmonary disease (COPD), and an adjustment disorder/PTSD, but did not have an impairment severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. R. 21. The ALJ determined that through the date of last insured, Plaintiff retained the residual functional capacity (RFC) to perform a reduced range of sedentary work, except Plaintiff was limited to standing or walking two hours, and sitting six hours in an eight-hour workday; occasional climbing of stairs, stooping, crouching or kneeling; and no climbing ladders, ropes, scaffolds or working near heights or dangerous moving machinery; and no exposure to temperatures extremes or concentrated respiratory irritants; Plaintiff was also limited to simple, routine tasks, occasional changes in work setting, and occasional interaction with the public. R. 23-24. Based upon Plaintiff's RFC, the ALJ determined that he could not perform past relevant work. R. 28. Considering Plaintiff's vocational profile and RFC, the ALJ applied the Medical-Vocational Guidelines (the grids), 20 C.F.R. Pt. 404, Subpt. P, App. 2, and, based on the testimony of the vocational expert ("VE"), the ALJ concluded that, within the period at issue, Plaintiff could perform work existing in significant numbers in the national economy as a ticket counter, a table worker, and a surveillance system monitor. R. 28-29. Accordingly, the ALJ found Plaintiff not disabled at any time from January 1, 2006, the alleged onset date, through September 30, 2009, the date last insured. R. 29.

Plaintiff now asserts three points of error. First, he argues that the ALJ erred by failing to fully and fairly develop the record. Second, he claims the ALJ erred by failing to call a medical expert. Third, Plaintiff contends the ALJ erred by not including his hearing limitations in the hypothetical question to the VE, and by not including them in any findings at all. All arguments are thoroughly considered, though not in the order presented by Plaintiff. For the reasons that follow, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**.

## II.      STANDARD OF REVIEW

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla – *i.e.,* the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"If the Commissioner's decision is supported by substantial evidence, this Court must affirm, even if the proof preponderates against it." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n. 8 (11th Cir. 2004). "We may not decide facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner.]" *Id.* (internal quotation and citation omitted). *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord, Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

The ALJ must follow five steps in evaluating a claim of disability. *See* 20 C.F.R. §§ 404.1520, 416.920. First, if a claimant is working at a substantial gainful activity, he is not disabled. 20 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is

disabled. 20 C.F.R. § 404.1520(d). Fourth, if a claimant's impairments do not prevent his from doing past relevant work, he is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a claimant's impairments (considering his residual functional capacity, age, education, and past work) prevent him from doing other work that exists in the national economy, then he is disabled. 20 C.F.R. § 404.1520(f).

## III.      ISSUES AND ANALYSIS

### A.      RFC findings

Residual functional capacity is an assessment based on all relevant evidence of a claimant's remaining ability to do work despite her impairments. 20 C.F.R. § 404.1545(a); *Lewis v. Callahan*, 125 F.3d 1436,1440 (11th Cir. 1997). The focus of this assessment is on the doctor's evaluation of the claimant's condition and the medical consequences thereof. *Id.* Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. *See Lewis*, 125 F.3d at 1440; *Edwards*, 937 F.2d at 583; 20 C.F.R. §§ 404.1527(d), 416.927(d). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

Plaintiff had a history of syncope (loss of consciousness) and dyspnea (shortness of breath) that led to cardiac evaluations. At the administrative hearing on December 19, 2012, in addition to other complaints, Plaintiff testified that his heart impairment and stress caused him to faint, and his

mental impairments caused nightmares, irritability, mood swings, anger, stress, headaches, dizziness and difficulty sleeping[2]; and he had difficulty hearing.  R. 43-46, 48, 55, 769.

The ALJ considered the medical evidence and Plaintiff's testimony in finding he had the RFC for a reduced range of sedentary work:

> As for opinion evidence, Patrick Mathias, M.D., one of the claimant's treating physicians, has indicated in 2006 that the claimant is totally disabled, and has filled [out] a State of Florida Division of Retirement questionnaire, and opined that the claimant was permanently disabled to work an officer or employee of the State of Florida. (Exhibit B19F/53-55). Dr. Mathias also submitted a letter in 2012 summarizing the claimant's treatment. He indicated that he cared for the claimant from 2003 until 2006 for hypertension, fatigue, and syncope for that period. He recounted that testing showed cardiomyopathy and a markedly positive tilt table test for neurocompressive syncope leading to a conclusion that the claimant was unable to work in March 2008. He acknowledged that testing during this period showed normal coronary arteries, but continued cardiomyopathy. The claimant returned to his care in 2011 and experienced a subsequent deterioration in his cardiac status, with myocardial infarction and decompensated heart failure in 2012, as well as also poorly controlled [diabetes] with neuropathy and foot ulcer. Dr. Mathias concluded that the claimant's combined impairments make it impossible for him to work. (Exhibit B26F). He also indicated in a form that the claimant was unable to perform even a sedentary level of exertional activity over an 8-hour workday (Exhibit B24F).
>
> The undersigned gives little weight to Dr. Mathias' opinion that the claimant's impairments were disabling during the period through the date last insured of September 30, 2009, as the evidence during the period at issue shows no coronary artery disease, only mild cardiomyopathy, an ejection fraction of from 40-50%, and no ongoing treatment for syncope. There was no evidence of significant limitations related to diabetes or hypertension during this period, or significant headache pain. There is no treatment for a specific respiratory impairment or obstructive sleep apnea. Further, the claimant's testimony indicates that his daily activities, described above, were fairly full and consistent with a range of sedentary work. The undersigned acknowledges that the subsequent record, particularly beginning in 2012, shows a significant deterioration in the claimant's cardiac status with the onset of ischemic coronary artery disease and decompensated heart failure, as well as diabetic complications. However, during the period at issue, the record supports a conclusion that the claimant's combined impairments, including his obesity, did not preclude a range of sedentary work.

---

[2]Plaintiff does not specifically challenge the ALJ's findings regarding his mental impairments, *i.e.*, that Plaintiff's mental impairments did not require hospitalization, and his progress notes show that his mood was often euthymic, with full range of affect and logical goal-oriented thought process and Plaintiff's demeanor was appropriate, polite, and cooperative (R. 27, 827-28, 832, 840-41, 845). One of Plaintiff's therapists refused to write a letter saying he needed long-term care based on suspicion he was malingering (R. 841), and expressed a concern that his main treatment goal was to obtain disability benefits.  R. 27, 841.  As noted by the ALJ his therapist also noted that Plaintiff asked "whether or not he was depressed enough for disability."  R. 27, 845.

R. 27.

In August 2003, Plaintiff was diagnosed by Cardiovascular Associates (Dr. Laddu) with dyspnea which did not appear to be cardiac in nature, diabetes, hypertension and obesity R. 519.  A September 2003 stress test showed Plaintiff had extremely poor exercise tolerance for his age and a subsequent echocardiogram at Cardiovascular Associates (Dr. Massey) revealed an enlarged left ventricle with global hypokinesis with left ventricular ejection fraction of 40%; left atrium at the upper limit of normal; normal aortic, initrial and tricuspid valves, and the conclusion that "the patient appears to have dilated cardiomyopathy with moderate reduction of left ventricular ejection fraction." R. 516-17.

In July 2005, Plaintiff had a left heart catheterization, coronary arteriography, and left ventriculography[3] for his cardiomyopathy, minimal troponin elevation, and syncope.  R. 508.  Dr. Mathias of Cardiovascular Associates opined that Plaintiff had mildly reduced left ventricular ejection fraction; left main, left anterior descending and right coronary arteries widely patent; and unremarkable hemodynamics; however, he had severe disease in a very tiny diagonal vessel, seen on only one projection; his heart size was normal.  R. 502-09.  His diabetes was poorly controlled.  R. 502.  Dr. Mathias opined that Plaintiff "has atherosclerosis, clearly documented.  He requires very aggressive risk factor modification with perhaps bringing his LDL cholesterol down below 70."  R. 509.  His neurological workup was negative.  R. 502. He was continued on medications to treat his condition; he also required "optimal diabetic control" and "lipid control/optimization of lipids as an outpatient" in view of his elevated triglyceride, which would need to be done by his primary care doctor and/or endocrinologist.  R. 504, 509.

In July 2005, Dr. Shah of the Orlando Regional Healthcare System advised a cardiac diabetic diet, medications, activity, exercise, and lifestyle changes; his condition was stable.  R. 505.  Dr. Shah

---

[3]The right coronary artery was "free of significant disease."  R. 508.

scheduled him for a tilt table test in view of his reported history of syncopal episodes in the past (R.

504) and the results of the test were positive and he was diagnosed with orthostatic hypotension and

neurodepressor syncope.  R. 501, *see also* R. 769.  In September 2005, Dr. Mathias noted the syncopal

spells occur with stress; he has had a few episodes; the Tilt [table test] was abnormal, but some of the

spells have been in his sleep and sitting down, which is atypical for vasovagal syncope." R. 498.  Dr.

Mathias noted "tilt training instructed. . . . He needs cardiac rehab.  I am concerned about the syncope

seeing as how he is a corrections officer."  R. 500.

In November 2005, Dr. Mathias noted that Plaintiff had reported two episodes of syncope; he

opined then Plaintiff was "permanently disabled." R. 781.  Dr. Mathias reiterated his opinion in

March 2006 that Plaintiff was "disabled."  R. 494, 765.   On July 17, 2006, Dr. Mathias opined that

Plaintiff was not capable of maintaining employment; he could not return to his past work; and

coronary artery disease was not a significant contributing factor to his syncope. R. 765.

 On February 19, 2007, a computerized tomography ("CT") scan revealed abnormalities in the

right ear.  R. 341.  On May 18, 2007, Plaintiff underwent ear surgery for chronic otitis media in both

ears with mixed hearing loss.  R. 298-299.

Plaintiff also experienced an episode of congestive heart failure on February 26, 2007, and was

hospitalized at Twin Rivers Regional Medical Center for four days; diagnosis with congestive heart

failure, atherosclerotic heart disease, chest pain, hypertension and diabetes. R. 306-09. The cardiac

catheterization in March 2007 showed normal coronary arteries, and mild dilatation with the left

ventricular ejection fraction around 40%, and no evidence of regional wall motion abnormalities.  R.

307, 569.

In August 2008, Plaintiff was hospitalized at Twin Rivers Regional Medical Center for three

days and diagnosed with congestive heart failure exacerbation, mild, with systolic dysfunction and

severe obstructive lung defect; he was given medication in order to see if that would help his lung

function but it did not change his shortness of breath.  R. 272.  He continued to complain of shortness

of breath, however, the laboratory data was "not very abnormal" and Dr. Puckett (listed as his Primary

Care Physician - R. 754) noted that he had been walking around the halls consistently in normal street

clothes rather than a hospital gown (as the doctor told him she had seen him), and with ambulation

that she had witnessed he was perfectly stable.  R. 272.  The doctor noted:

> Whenever I told him that we could send him home on Lasix therapy, he said that he
> thought that he did have some Lasix at home and proceeded to pull out of a medicine
> bag a bottle from Dr. Osorio that was prescribing Lasix 40 mg p.o. twice a day on a
> daily basis.  He states that he has not been taking this.  On admission, his only report
> of a medicine being taken at home was his insulin.  Given his stable nature at this
> point and the evidence that he has just simply in the past been noncompliant with
> treatment, *which is likely why he keeps returning to the hospital*, I spoke with him
> about whether or not to keep him in the hospital over the weekend or to go ahead and
> send him home.  He stated that he felt well enough to go home and I impressed upon
> him the importance of following up with a physician and taking his medications as
> prescribed and he agreed to do this.

R. 273 (emphasis added).

The August 2008 echocardiogram continued to show mild cardiomyopathy with the left

ventricle mildly dilated and ejection fraction of 40%, mild mitral insufficiency, dilated left atrium,

dilation upon the inferior vena cava with poor collapse with inspiration indicating elevated pressure

in the right atrium, and mild mitral insufficiency.  R. 267-71. A follow up CT in August 2008 was

within normal limits. R. 594.  Dr. Osorio, the cardiologist, noted poor compliance and spent most of

the time with Plaintiff trying to educate him regarding the risk of nonischemic cardiomyopathy and

the deterioration that he is having to hi ejection fraction, but "the patient does not seem to quite

understand the importance of following up with cardiology and taking his medications on a regular

basis."  R. 754.

Plaintiff was again hospitalized at White County Medical Center in June 2009 with

unspecified chest pain. R. 548.  A chest x-ray showed the heart was mildly enlarged, with congestive

changes present; the right increased density in the lung based "may be related to overlapping

markings"; his chest was clear on examination and no peripheral edema was noted. R. 549-52. The hospital records showed Plaintiff wanted to go home and requested the doctor to discharge him without signing the "against medical advice." Plaintiff was informed of the risks and informed that he would not be discharged or released without signing the "against medical advice" form. R. 550.

Plaintiff's treating sources repeatedly noted his poor medication compliance. *See, e.g.,* R. 753-54. In July 2009, Dr. Osorio of the Cardiovascular Institute of Southern Missouri noted Plaintiff did not have a primary care physician at that time; he was a 44 year old male with a history of "very poor compliance with follow ups and medications." R. 753. He noted: "The patient is telling me that he is going into congestive heart failure very frequently and he has been going to the ER where he is given an IV of Lasix. The patient has not been taking the medications that he is supposed to be on." R. 753.

Plaintiff does not challenge the ALJ's decision to give little weight to Dr. Mathias' opinion that Plaintiff was "permanently disabled" from syncope or cardiac problems. She found there was no evidence of ongoing significant syncope because the records indicated by March 2006, Plaintiff reported "he was doing ok," with no current syncope, and the cardiac testing and treatment notes did not reflect the degree of cardiomyopathy that would preclude a limited range of sedentary work. R. 25, 769. However, Plaintiff does challenge other aspects of the decision regarding the ALJ's findings concerning his RFC and that he was not disabled during the relevant period.

## 1. Hearing impairment

Plaintiff argues that the ALJ erred in failing to include Plaintiff's hearing impairment in the hypothetical question to the vocational expert or in the RFC finding. Doc. 17 at 16. The Commissioner argues that the ALJ is not required to include findings in a hypothetical question that she has properly rejected as unsupported, and in this case, the hypothetical question posed to the VE included only those limitations the ALJ found to be credible.

Plaintiff is correct that case law in this circuit requires that the ALJ employ hypothetical questions which are accurate and supportable on the record and which include all limitations or restrictions of the particular claimant. *Pendley v. Heckler*, 767 F.2d 1561 (11th Cir. 1985). Where the hypothetical employed with the vocational expert does not fully assume all of a claimant's limitations, the decision of the ALJ, based significantly on the expert testimony, is unsupported by substantial evidence. *Id.* at 1561 (quoting *Brenam v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980)).

The ALJ found that Plaintiff suffered from the severe impairments of obesity, hypertension, cardiomyopathy, diabetes mellitus, coronary artery disease, COPD, and an adjustment disorder/PTSD; and Plaintiff retained the RFC to perform a reduced range of sedentary work (through the date of last insured– September 30, 2009), with additional exertional, mental, and postural limitations.  R. 21, 23-24.  The ALJ did not include a hearing impairment in the hypothetical to the VE, who opined that there were other jobs in the economy that the hypothetical individual could perform.  R. 62-63.  The ALJ ultimately concluded, based on the VE's testimony, that Plaintiff could perform other work existing in the national economy, thus, he was not disabled during the period at issue. R. 29.  Plaintiff argues that he could not perform the other jobs cited by the VE and relied upon by the ALJ with his hearing impairment.

As evidence of his hearing impairment, Plaintiff points to a February 2007 CT scan which revealed abnormalities in the right ear, Plaintiff's need for ear surgery for chronic otitis media in both ears with mixed hearing loss, and medical records which reported cholesteatoma and tubes in both ears, diagnosed hearing loss, chronic otitis externa, foreign body (a piece of a Q-tip) in the ear, tube disorder, and tinnitus. R. 341, 702-08.

The Commissioner argues Plaintiff fails to identify evidence showing he had significant and continuous hearing loss during any time between his alleged onset date and his date of last insured (January 2006 to September 2009).  The Commissioner contends that the evidence shows that during

a limited period in May 2007, Plaintiff had inflammation or infection in both ears causing mixed hearing loss, but he underwent ear surgery to address the issue, and the record does not show his hearing loss persisted following the surgery; at an examination in June 2009, Plaintiff's ears were normal on inspection, and June and November 2012 progress notes show that on examination, Plaintiff had "normal hearing threshold." R. 251, 298-99, 796, 800. The Commissioner points out that Plaintiff relies exclusively on medical records from August 2012 – three years after the date of last insured in September 2009 – for his argument his ear impairments caused hearing loss. R. 702, 703.

Hearing loss that is intermittent would not meet the duration requirement for a finding of disability. See 20 C.F.R. § 404.1505(a) (providing claimant must show she was not able to engage in substantial gainful activity by reason of a medically determinable impairment that could result in death, or had lasted or was expected to last, for a continuous period of not less than twelve months). Plaintiff does not cite to any records which evince an ongoing, continuous hearing problem that remained after the surgery in May 2007. Nor does he list a hearing impairment as a disabling medical condition in forms he completed for the SSA specifically asking him to list his impairments. R. 165, 170. The ALJ's omission of a hearing impairment in Plaintiff's RFC and in the hypothetical to the VE was based on substantial evidence.

## 2.   Medical expert

Plaintiff argues that the ALJ committed reversible error by failing to call a medical expert to establish Plaintiff's onset date of disability. The Commissioner contends that the ALJ properly found that Plaintiff was not disabled through his date last insured without having obtained medical expert testimony.

Social Security Ruling ("SSR") 83-206 provides:

In addition to determining that an individual is disabled, the decisionmaker must also establish the onset date of disability. In many claims, the onset date is critical; it may affect the period for which the individual can be paid and may even be determinative of whether the individual is entitled to or eligible for any benefits.

* * *

In determining the date of onset of disability, the date alleged by the individual should be used if it is consistent with all the evidence available. . . . In some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination . . . At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred. If there is information in the file indicating that additional medical evidence concerning onset is available, such evidence should be secured before inferences are made. If reasonable inferences about the progression of the impairment cannot be made on the basis of the evidence in file and additional relevant medical evidence is not available, it may be necessary to explore other sources of documentation. Information may be obtained from family members, friends, and former employers to ascertain why medical evidence is not available for the pertinent period and to furnish additional evidence regarding the course of the individual's condition.

1983 WL 31249.

Plaintiff further argues that the ALJ should not have substituted her judgment for that of a medical expert by noting:

The subsequent record, particularly beginning in 2012, shows a significant deterioration in the claimant's cardiac status with the onset of ischemic coronary artery disease and decompensated heart failure, as well as diabetic complications. However, during the period at issue, the record supports a conclusion that the claimant's combined impairments, including his obesity, did not preclude a range of sedentary work.

R. 26.

Plaintiff concedes that the Eleventh Circuit has addressed the issue, albeit in an unpublished decision, *Klawinski v. Commissioner of Social Security*, to hold that the ALJ is only required to obtain the opinion of a medical expert in certain instances to determine a disability onset date *after* a finding of disability. 391 Fed. Appx. 772, 776 (11th Cir. 2010). Plaintiff then cites non-binding decisions from other circuits to argue a medical expert should have been called.

The Commissioner relies on *Klawinski* and another Eleventh Circuit unpublished decision. *Madison v. Barnhart*, No. 03-11090, slip op at *3 (11th Cir. Aug. 22, 2003), arguing that the ALJ did not find Plaintiff disabled at any time during the period before her, thus, SSR 83-20 is not applicable to this case and no medical expert was necessary. The Commissioner argues, even if it were required,

-13-

the medical evidence was sufficient for the ALJ to determine Plaintiff was not disabled at any time through September 30, 2009.

Unpublished opinions of the Eleventh Circuit are not binding but constitute persuasive authority. *See* 11th Cir. R. 36-2 and I.O.P. 6. Opinions from other circuit courts, published or not, do not supersede the Eleventh Circuits persuasive opinions. Because substantial evidence demonstrated Plaintiff was not disabled prior to his date last insured, there was no onset date of disability for the ALJ to determine.

### 3.   Records

Plaintiff claims that the ALJ did not properly develop the Record in this case because the ALJ failed to obtain Plaintiff's prior medical records from Plaintiff's former (Arkansas) attorney and a previous social security record before rendering a decision. The Commissioner contends that the ALJ properly developed the record because, even though the ALJ left the record open for several weeks for the additional records to be submitted (R. 57, 66), Plaintiff failed to submit them.

At the administrative hearing on December 19, 2012, the ALJ observed that Plaintiff had previously applied for DIB benefits, and the previous administrative law judge had issued an unfavorable decision on March 22, 2010, finding Plaintiff not disabled through his date last insured; the Appeals Council denied the request for review and that denial was not appealed to federal court. R. 19, 40-41. The ALJ noted Plaintiff argued the current record included new and material evidence relevant to the same period, and the ALJ stated she would not apply res judicata but would consider whether Plaintiff was disabled from his alleged onset date (January 1, 2006) through his date last insured (September 30, 2009). R. 19; R. 29. Plaintiff contends that the ALJ's decision was not based on substantial evidence because the ALJ had  failed to obtain the social security file from the prior

decision and/or the file from Plaintiff's former counsel, so that additional evidence from the relevant time period was not considered in the application[4].

At the hearing on December 19, 2013, Plaintiff's counsel represented that she was working to obtain additional mental health records and some worker's compensation records. R. 59. When counsel was asked if there was anything else that she knew was missing, she said the "main sources during that period were Osorio, Mathias, Twin Rivers, White County, pulmonary disease, and everything else is now. R. 59. The ALJ agreed to leave the Record open for three weeks to receive the medical records. R. 66.

On February 12, 2013, the ALJ sent Plaintiff's counsel a fax reminding counsel of the three week deadline (from December 19, 2012) to submit worker compensation medical records and mental health records; the ALJ allowed Plaintiff another five days to submit that evidence, but cautioned that "If the hearing office has not heard from you in that time, the administrative law judge will make a decision based on the evidence in the file." R. 225. Three days later, Plaintiff responded that he did not have the evidence from his former case and his former attorney in Arkansas was seeking $115 for a copy of the file containing the records. R. 223. Plaintiff's counsel therefore was requesting the ALJ's "assistance in obtaining the medical records." R. 223. If the ALJ could not obtain the records from Plaintiff's former counsel, then Plaintiff current counsel requested that she be told of that in writing. R. 223-24.

On April 22, 2013, the ALJ responded and asked Plaintiff's counsel to identify, within ten days, the medical sources, their addresses and the dates of treatment, so that the hearing office could obtain the records directly from the sources. R. 226. Plaintiff's counsel responded on May 3, 2013: "Unfortunately, the client cannot provide the specific information that his former attorney had in his prior case. In light of the client's prior ALJ decision and remote DLI, the purpose of requesting your

---

[4]Plaintiff's representative stated that she "didn't have access to the prior application." R. 41.

assistance in obtaining the records from his former attorney was to make sure you had a complete file when making the determination on his claim for benefits. R. 227.  In the decision, the ALJ noted that "[t]he claimant's representative has requested that record[s] from the claimant's prior attorney in conjunction with a worker's compensation claim be subpoenaed to obtain additional information. No specific records or sources have been identified as outstanding. The undersigned declines the request, finding the current record sufficient to fully evaluate the claimant's mental and physical status during the period at issue." R. 28.  Following Plaintiff's refiling of an application for DIB on June 1, 2012, the decision was finalized on April 22, 2011.  R. 70, 78, 161.

Plaintiff now argues that his counsel asked the ALJ to obtain Plaintiff's prior Social Security file (apparently from Plaintiff's former counsel in Arkansas), and when she did not obtain the file and rendered her decision without it, the ALJ erred by failing to fully and fairly develop the record. Plaintiff argues that the ALJ was required to obtain the prior file based on SSA internal guidance documents, the Commissioner's Hearings, Appeals and Litigation Law Manual ("HALLEX") and the Program Operations Manual System (POMS).

Plaintiff points to HALLEX Section I-2-6-584, which provides that "[i]f there was a prior ALJ decision, the ALJ must associate the prior ALJ decision with the current claim(s) file," and to POMS DI 20505.010 which provides that the field office will associate any prior folder with the current claim or document the claim to identify prior claims activity when it is sent to the Disability Determination Services; sometimes, it is necessary to have the prior folder in order to adjudicate a current claim.

Plaintiff contends that, in this case, because the ALJ noted that there was a prior unfavorable ALJ decision dated March 22, 2010 and Plaintiff was "arguing that the record currently includes new and material evidence for this period," (R. 19), the ALJ should have requested the prior folder from the Social Security Administration or paid for the copied file from Plaintiff's former attorney because,

otherwise, the ALJ could not determine if the record included new and material evidence when she did not have the prior folder for comparison.

The Commissioner argues that the ALJ was not required to order additional medical evidence, and Plaintiff's circumstances are much narrower than the broad principle he states here.  When Plaintiff's counsel represented at the hearing that she was working to obtain additional mental health records and some worker's compensation records, the ALJ agreed to keep the record open for three weeks so that Plaintiff could submit those specific records. R. 57-59.  At the same time, Plaintiff's counsel also specifically listed Plaintiff's primary health care providers during the relevant period (between the alleged onset date January 1, 2006 and the DLI, September 30, 2009), which were Osceola Regional Medical Center, Patrick Mathias, M.D., Twin Rivers Regional Medical Center, and White County Medical Center. R. 59.  The Commissioner points out that Plaintiff, without identifying any specific medical records allegedly missing, asked the ALJ to obtain his records from his former attorney who was requesting $115 to release those records (R. 223); Plaintiff has not pointed to any SSA requirements –internal, regulatory, or statutory– that the ALJ had an obligation to obtain the file from Plaintiff's former workers compensation counsel.

The Commissioner contends that the ALJ requested Plaintiff identify the medical sources, addresses, and dates of treatment so that the ALJ could retrieve the alleged missing records directly from Plaintiff's health care providers (R. 226), but Plaintiff failed to provide the information requested by the ALJ (R. 227). Consequently, the Commissioner argues, the ALJ was not required to order additional medical evidence because the ALJ has no duty to order additional medical evidence where the evidence in the record is sufficient to support the ALJ's disability determination. *See Wilson v. Apfel*, 179 F.3d 1276, 1278 (11th Cir. 1999).

Plaintiff is correct that the ALJ has a duty to fully and fairly develop the record.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988).  In this case, the ALJ stated:

> The undersigned notes that the claimant's representative has requested that record from the claimant's prior attorney in conjunction with a worker's compensation claim be subpoenaed to obtain additional information. No specific records or sources have been identified as outstanding. The undersigned declines the request, finding the current record sufficient to fully evaluate the claimant's mental and physical status during the period at issue.

R. 28.

The Commissioner argues that the ALJ is only required to develop medical records for the twelve months preceding the month in which the claimant filed his application. *See Smith v. Comm'r of Soc. Sec.*, 501 F. App'x 876, 878-79 (11th Cir. 2012). As the Commissioner points out, Plaintiff's counsel stated at the hearing that she wanted to obtain records pertaining to a worker's compensation claim (R. 59); however, the Record contained documents from Plaintiff's worker's compensation claim, dated 2002 for a pedestrian-motor vehicle injury that occurred in 2000 (R. 854-56), several years before Plaintiff's January 1, 2006 alleged onset date and the period before the ALJ (R. 161).

The agency specifically requested records from Osceola Regional Medical Center, Dr. Mathias of Cardiovascular Associates, Twin Rivers Regional Medical Center, and White County Medical Center, as well as several other health care providers which consisted of more than 500 pages of medical records spanning from 2002 through 2012 (*see generally* R. 249-856), and more than 200 pages specifically related to the period at issue. *See generally* R. 260-62, 392-93, 423-25, 435-36, 453, 520-21, 529, 534, 760-62; R. 249-59, 263-350, 373-91, 493-95, 544-54, 569-81, 593-684, 752-57, 769-70, 822-45. The Commissioner also contends that the Record shows that SSA included records from Plaintiff's prior file as it includes a request for records dated February 27, 2007 from Cardiovascular Associates (R. 760-61) prior to the instant application for DIB in June 2012 (R. 161). The Commissioner also contends that, while the current Record does not include the prior ALJ decision, the ALJ did not apply res judicata to the prior claim and, thus, it did not impact the ALJ's decision of whether Plaintiff was disabled during the period at issue, and Plaintiff has not argued that he did not get a copy of the decision.

The Court has carefully reviewed the 874-page Record and found records for the relevant period have been obtained from the medical sources Plaintiff's counsel listed at the hearing as relevant:  Osceola Regional Medical Center, Patrick Mathias, M.D., Twin Rivers Regional Medical Center, and White County Medical Center (Ex. listed in the Medical Records Index as: B1F, B2F, B4F, B6F, B10F, B14F, B15F, B16F, B 17F, B19F, B20F, B21F, B22F, B23F, B24F, B25F, B26F, B28F).   Plaintiff's vague assertion that there are some records missing or the ALJ failed to obtain them is misplaced.  The ALJ's decision not to obtain unspecified additional medical records or the file from Plaintiff's former counsel in Arkansas was based on substantial evidence.

**IV.    CONCLUSION**

The record in this case shows that Plaintiff does not enjoy full health and that his lifestyle and activities are affected by his ailments to some degree.  The ALJ appropriately considered these circumstances and analyzed them in relation to the exacting disability standard under the Social Security Act.  For the reasons set forth above, the ALJ's decision is consistent with the requirements of law and is supported by substantial evidence.  Accordingly, it is respectfully **RECOMMENDED** that the Commissioner's decision be **AFFIRMED** pursuant to sentence four of 42 U.S.C. § 405(g), and the Clerk of the Court be directed to enter judgment and, thereafter, close the file.

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on December 22, 2014.

*David A. Baker*
_____
DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Courtroom Deputy